# Hillside Coal & Iron Co. *v.* Sterrick Creek Coal Co., Appellant.

*Mines and mining—Coal lease—Construction of lease—Increase of price as affecting royalties.*

A coal lease dated 1887 provided a royalty of twenty-five cents per ton on coal above the size of pea coal. The royalty on pea coal was ten cents, and on buckwheat coal five cents a ton. The lease further provided as follows: "From and after July 1st, 1892, when the price received for the average of all sizes of coal at the breaker above the size of pea coal shall be $2.15 per ton, the lessee shall pay twenty-five cents per ton royalty on the coal mined from the four-foot vein, and the same royalty on the pea coal and buckwheat coal from said vein, as is paid on the coal from other veins; and when the average price for the several sizes above the size of pea coal exceed the sum of $2.15 per ton, the lessee shall pay sixteen per cent. of any such excess. Provided that when the price of pea coal equals that of any of the sizes above pea coal, then, pea coal shall be included with the other sizes in making the average and shall be subject to the increased royalty." There was no "excess" until 1897. From 1897 to 1903, with the exception of certain intervals, there was an excess of $2.15 per ton, but no demand was made by the lessor for any increase of royalties on account of the excess. This was due to the fact that the terms of the lease as to excess royalty had been overlooked. After 1903 disputes prevailed between the parties as to the construction of the lease. No coal was mined from the four-foot vein until 1907. Litigation was begun in 1909 by the lessor to recover the excess royalty. *Held,* (1) that the excess of sixteen per cent. applied to all the coal covered by the lease and not to the coal from the four-foot vein only; (2) that the lessor was not estopped from claiming the excess; and (3) that the failure of the lessor to claim excess royalties from 1897 to 1903, did not justify the conclusion of a con-

temporaneous interpretation by the parties that no such excess
was due to the lessor.

Argued Jan. 13, 1913. Appeal, No. 154, Jan. T., 1911,
by defendant, from judgment of C. P. Lackawanna Co.,
Sept. T., 1909, No. 1199, for plaintiff in case of Hillside
Coal & Iron Co. v. Sterrick Creek Coal Company. Be-
fore FELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN,
STEWART and MOSCHZISKER, JJ. Affirmed.

Assumpsit for royalties under a coal lease.

The case was tried by the court without a jury under
the Act of April 22, 1874.

EDWARDS, P. J., filed the following opinion:

The controversy between the parties to this case in-
volves the interpretation or construction of the terms of
a coal lease, in which the plaintiff is lessor, and the de-
fendant, lessee.

The particular paragraph of the lease to be considered
and construed is the fifteenth, which reads as follows:

"Fifteenth.   From and after July First, A. D. 1892,
when the price received for the average of all sizes of
coal at the breaker, above the size of pea coal shall be
two dollars and fifteen ($2.15) cents per ton, the party
of the second part shall pay twenty-five cents per ton,
royalty, on the coal mined from the four-foot vein, and
the same royalty on the pea coal and buckwheat coal
from said vein, as is paid on the coal from other veins;
and when the average price for the several sizes above the
size of pea coal exceed the sum of two dollars and fifteen
($2.15) cents per ton, the parties of the second part shall
pay sixteen per cent. of any such excess; provided that
when the price of pea coal equals that of any of the sizes
above pea coal, then, pea coal shall be included with the
other sizes, in making up the average and shall be sub-
ject to the increased royalty."

Defendant contends that the fifteenth paragraph as a
whole relates to the coal from the four-foot vein only.

Plaintiff contends that while the first part of the paragraph, down to the first semi-colon (;) refers to the coal from the four-foot vein, the remaining part of the paragraph refers to the coal from all the veins. If the contention of the defendant be sustained, judgment should be entered for the defendant; otherwise, judgment for the plaintiff in a sum exceeding three hundred thousand dollars. It also appears that this sum of money is not all that is involved in the dispute between the parties. The judgment to be entered in this case will determine the amount of royalty to be paid by the lessee in the future; and this amount, evidently, will run into large figures.

### FINDINGS OF FACT BY THE COURT.

1. On the 14th day of June, 1887, a coal lease was executed by and between the Hillside Coal and Iron Company, plaintiff, and the Grassy Island Coal Company, Limited, as lessee. This coal lease, Exhibit A of plaintiff's statement, on March 15, 1892, was duly assigned by the said lessee to the Sterrick Creek Coal Company, the defendant in the present case, who thereby assumed all the obligations, and succeeded to all the rights of the lessee under the original lease. Since the last mentioned date the defendant has been in possession of the property described in the lease, and has been engaged in the mining of coal from the veins contained in the property and in preparing and shipping the coal for market.

2. It may be rightly stated that the sole question in dispute in this case is the amount of royalty to be paid by the lessee, under the fifteenth paragraph of the lease. A. "When the parties signed the lease in 1887 and agreed that a certain fixed and definite royalty price per ton should be paid for the coal mined, they evidently had in mind the probability that at some time in the future the coal market would improve to such an extent as to justify the payment to the lessor of a larger royalty than the specific rate per ton mentioned in the lease. To

meet this contingency, the fifteenth paragraph provided, inter alia, a division of any excess, received by the lessee, over and above a certain price per ton paid for coal at the breaker; that is the lessor should receive a percentage of the excess. The exact words of this provision are as follows: "And when the average price for the several sizes above the size of pea coal exceed the sum of two dollars and fifteen ($2.15) cents per ton, the parties of the second part shall pay sixteen per cent. of any such excess."

The facts disclosed by the pleadings and the evidence as to the period when the percentage of the said excess first became payable to the lessor are undisputed; and there is no dispute as to what the parties did, or did not do, in relation to the matter. The first lessee mined coal from the property leased for a period of nearly five years; and then, in 1892, the defendant began and continued the mining of coal under the same conditions. There was no "excess" until after the month of May, 1897. At that time, and for the first time, the price of coal at the breaker exceeded $2.15 per ton; but neither of the parties paid any attention to this fact. The same routine method in the treatment of royalty accounts was observed as in the preceding period of five years. Monthly reports of coal mined were sent to the lessor, and vouchers for royalty were signed by the lessor monthly "in full of above account." Although the excess over $2.15 per ton prevailed from May, 1897, to the institution of the present suit in 1909, with the exception of certain intervals of several months in the years 1898, 1899 and 1900, yet, no claim was made by the lessor for its share of the excess, nor was there any agitation between the parties in regard to the subject until about September, 1903.

3. In the year 1902, Mr. Peterson became superintendent of the plaintiff company, and his chief clerk was Mr. Taylor. Early in September (or late in August), 1903, at the request of Mr. Peterson, Mr. Taylor, who

was about going to Europe, made a synopsis of the
plaintiff's leases, among which was the lease involved
in the present case. It was then that the importance of
the proper interpretation of the fifteenth paragraph was
considered for the first time by the plaintiff. The matter was called to the attention of Mr. May, the general
manager of the lessor; and then it became the subject of
correspondence between the representatives of the lessor
and lessee, supplemented by the opinions of the attorneys as to the meaning of paragraph fifteen.

4. The vouchers for coal royalties, from September,
1903, when the dispute between the parties first arose, to
December, 1904, were signed by the officers of the plaintiff company in the usual way; that is, "in full for the
above account." After that time, the vouchers were
receipted "on account, without prejudice to claim for
additional royalty due under lease dated June 14, 1887."
B. "The fact that the vouchers were receipted in the
manner stated during the period first mentioned is of no
particular significance, because of the pendency of negotiations between the parties. The fact stated cannot
be used to the prejudice of the plaintiff, nor in support
of defendant's contention." The letters passing between
the representatives of the two companies and the opinions of counsel on the question in dispute are to be found
in the record and they explain themselves. It is proper
for us to find as a fact that from September, 1903, to the
beginning of the suit in this case, sincere efforts were
made by the parties to settle the controversy. It is admitted on the record that subsequent to February, 1905,
the attempts to secure a settlement of the dispute by
arbitration failed through no fault on the part of either
party.

5. Although the average price of coal above pea, at the
breaker, exceeded $2.15 per ton for a certain portion of
the period from May, 1897, to September, 1903; that is,
at separated intervals, aggregating 54 out of the 76
months constituting the said period; nevertheless, the

plaintiff during all this time failed to demand any share of the excess now claimed by it under the fifteenth paragraph of the lease. The failure of the plaintiff to make such a demand was not the result of a consideration or an interpretation of the terms of said paragraph; but, rather, it was the result of an oversight on the part of plaintiff's employees, who, during the period mentioned overlooked the terms of the lease as to excess royalty.

6. C "Plaintiff makes no claim for royalty on coal mined from the four-foot vein. Defendant did not begin the mining of coal from this vein until the year 1907. The references in the lease and in the evidence to the four-foot vein and to the royalty to be paid on its coal are significant only as an aid to the proper interpretation of the fifteenth paragraph of the lease."

7. Exhibit C of plaintiff's declaration gives in detail the figures representing plaintiff's claim for unpaid royalty under the terms of the lease. The accuracy of the figures is not controverted by the defendant. The amount of the unpaid royalty due from defendant to plaintiff to August 1, 1909, not including any royalty for July, 1909, is $317,475.83; to which sum interest should be added.

### CONCLUSIONS OF LAW BY THE COURT.

1. D. "The evidence and the pleadings disclosed no facts which would justify the application of the principle of estoppel as against any part of the plaintiff's claim."

2. E. "The evidence pertaining to the acts and conduct of the parties in relation to the payment of royalties from the year 1897; to the year 1903, is not of such a character as to justify the conclusion of a contemporaneous interpretation by the lessor and lessee of the fifteenth paragraph of the lease."

3. F. In order to ascertain the meaning of paragraph fifteen, the rules of punctuation and of grammatical construction are of secondary importance. The fair con-

struction of the paragraph does not depend solely on the rules of grammar and punctuation.

4. The words of said paragraph and of the whole contract between the parties should be given a reasonable construction, equitable to the parties, and which will not result in giving to one an unfair or unreasonable advantage over the other. The intention of the parties is to be gathered from the whole lease and not from any detached portion of it. G. "Following these rules of construction, we conclude that the excess of sixteen per cent. mentioned in said paragraph fifteen applies to all the coal covered by the lease, and not to the coal from the four-foot vein only."

5. H. "Judgment should be entered in favor of the plaintiff and against the defendant for the sum of $317,-475.83, with interest."

THE PARTIES TO THE LEASE AND THE SUBJECT-MATTER THEREOF; PARTICULARLY THE ROYALTY CLAUSES.

The parties are two mining companies operating coal mines in the anthracite coal field. The plaintiff, the Hillside Coal and Iron Company, in addition to operating mines of its own, leased a certain tract of land to the Grassy Island Company, Limited, to whose rights the defendant company succeeded as lessee. It can be easily gathered from a reading of the lease that the officers of the two companies were acquainted with the coal business, the methods of mining, the question of royalties and the market rates for coal. It is a significant circumstance that these coal men, united in the anticipation that the coal market would improve at some time in the future, and, therefore, provided by the fifteenth paragraph that the lessor should be a beneficiary of a proportionate share of the improved conditions. The record shows that these improved conditions did not materialize until ten years later; but, the fact that they mutually provided for such a contingency shows the knowledge the parties had of the subject-matter of their

contract. A discriminating foresight is also shown by the parties in their treatment of the four-foot vein. On account of its thinness as a vein, an exception was made in its favor in the rate of royalty, with a sliding advance scale as the vein improved in thickness, until it reached a certain standard when it was no longer entitled to any discrimination in its favor. The benefits of the matters referred to were mutual, the lessor benefiting by the provision for excess royalty in the future, and the lessee by a lower rate of royalty for the four-foot vein. These facts, as well as the other provisions of the lease, suggest to us that the parties to the lease knew what they were doing and were fully able to look after their respective interests.

So far as the question bears upon the determination of the dispute in the present case the lease includes two important matters, viz: the leasing of the coal by the lessor, and the rate of royalty to be paid by the lessee. The rate of royalty is goverened by the third and fifteenth paragraphs of the lease. The other sixteen paragraphs are not drawn into the controversy.

In the demising clause the plaintiff leases to the defendant "all the coal in or under all those certain tracts"; and, in the second paragraph, the defendant agrees to mine the coal in "all the veins which are of workable thickness." The mining operation in contemplation was evidently not a small one. The tracts contained several veins of coal, and the minimum was fixed at 60,000 tons per annum exclusive of pea coal. The record of the mining in subsequent years also shows the extensive character of the work.

After the provision demising the coal there comes next naturally, as in all coal leases, the important question of royalties. How much per ton shall the lessee pay for the coal mined? As stated the provisions relating to royalties are to be found in the third and fifteenth paragraphs of the lease. These provisions might properly have been included in one paragraph, or, at least, in

two successive paragraphs. The fifteenth paragraph is the last paragraph of a practical character in the lease. To any person reading the lease, the inquiry readily suggests itself as to why the parties provided for the royalties in the third paragraph and then proceeded in the next eleven paragraphs to treat of matters absolutely unconnected with the question of royalties, again resuming the consideration of the royalty question in the fifteenth paragraph. It must be remembered that the third paragraph apparently furnishes a complete treatment in itself of the subject of royalties. There appears to be nothing omitted. The lease would be a complete instrument without the fifteenth paragraph. What are the provisions of the third paragraph relating to royalties? They are briefly as follows:

*a.* The lessee shall pay 25 cents per ton for coal above the size of pea, 10 cents per ton for pea coal, and 5 cents per ton for buckwheat coal.

*b.* When pea and buckwheat coal shall bring more than 50 cents per ton at the breaker, the lessor shall receive six per cent. of the excess.

*c.* When the price of pea and buckwheat reaches the lowest price paid for the other sizes, pea and buckwheat shall pay 25 cents per ton, the same as the other sizes.

*d.* An exception is made as to the four-foot vein. When the coal in said vein shall be $2\frac{1}{2}$ feet in thickness the royalty shall be 15 cents for sizes above pea and $7\frac{1}{2}$ cents for pea; when $3\frac{1}{2}$ to $4\frac{1}{2}$ feet in thickness, the royalty shall be 20 cents and ten cents; when over $4\frac{1}{2}$ feet, the same price shall be paid as for the coal from the other veins.

The question of royalties being so thoroughly covered by the third paragraph, what reason was there for inserting the fifteenth paragraph near the end of the lease? We know of only one reason, and this may be fairly gathered from the lease. The provisions for royalty found in the fifteenth paragraph were apparently a matter of further consideration by the parties. The third para-

graph provided for the period beginning in 1887, when the lease was signed; the fifteenth paragraph related to the beginning of a new period in the future, at least five years distant. As a matter of fact it was ten years before the condition mentioned in said paragraph occurred. The date at which the new period was to begin, in the judgment of the parties to the lease, depended on improved conditions in the coal market; that is, when the price of coal at the breaker for sizes above pea exceeded $2.15 per ton, but not before July 1, 1892. To meet this anticipated contingency the parties agreed upon the fifteenth paragraph.

It is undoubtedly unfortunate that the paragraph did not express more clearly the intentions of the parties as to the excess royalty; nevertheless, we have found no difficulty in ascertaining these intentions by an inspection of the lease and a consideration of all its terms.

The third and fifteenth paragraphs of the lease, being the only paragraphs relating to royalties, should be construed together. In the orderly arrangement of the provisions as to royalties, we would take the first part of the fifteenth paragraph, clause *a,* and place it with the exception in favor of the four-foot vein, found in the third paragraph, so that the whole exception pertaining to that vein would read thus:

"Provided, however, that the above royalty shall not apply to the vein known as the four-foot vein, between the Slope and Grassy Island veins, but payments shall be made in the manner aforesaid, for the coal mined from said vein as follows:

"When the coal in said vein shall be three and a half feet or less in thickness, fifteen cents per ton, for all sizes above pea coal, and half price for pea coal; when the coal in said vein shall be from three and a half to four and a half feet in thickness, twenty cents per ton shall be paid for all sizes above pea and half that price for pea coal; and when the coal in said vein shall be over

four and a half feet in thickness, the same price shall be paid as is specified for the other veins.

"From and after July First, A. D. 1892, when the price received for the average of all sizes of coal at the breaker above the size of pea coal shall be two dollars and fifteen ($2.15) cents per ton, the party of the second part shall pay twenty-five cents per ton, royalty, on the coal mined from the four-foot vein, and the same royalty on the pea coal and buckwheat coal from said vein, as is paid on the coal from other veins."

It is clear that the "coal at the breaker," mentioned in clause *a*, is the coal from all the veins and not from the four-foot vein only, and that "the average of all sizes above the size of pea coal" bringing $2.15 per ton means the average of all sizes obtained from all the veins. When the price reaches the point named, then, the coal from the four-foot vein shall pay the same royalty as the coal from the other veins. It will be noticed that this clause *a* refers to no excess. The moment the price of coal at the breaker touches $2.15 per ton, that moment the discrimination in favor of the four-foot vein vanishes. If the average price of coal at the breaker exceeds $2.15 per ton, then, the second part of the fifteenth paragraph, clause *b*, in general terms, applicable surely to the coal from all the veins, provides that the lessor shall receive sixteen per cent. of "such excess."

By making clause *a* of the fifteenth paragraph a part of the exception at the end of the third paragraph, which exception deals entirely with the four-foot vein, all the royalty provisions relating to said vein are brought together. And what is the result? If either of two things happen, the four-foot vein loses all favor. If the coal in the vein shall acquire a thickness of more than four and a half feet, it shall be subject to the same royalty charges as the coal from the other veins, regardless of the price of coal at the breaker; or if after July 1, 1892, coal at the breaker bring $2.15 per ton, then, the coal from the four-foot vein should bear the same royalty as all the other

coal, regardless of the thickness of said vein. Of course, the coal from all the veins share in the excess royalty provided in clause *b* of the fifteenth paragraph.

We do not have to go far to seek the reason for the discrimination in favor of the four-foot vein. It was concededly an inferior vein; but the parties to the lease understanding the mining of coal and the coal business, agreed that when the vein would show more than four and one-half feet of coal, it would cease to be an inferior vein and should pay the same royalty as the coal from the other veins; or, when the average of all sizes of coal above pea brought $2.15 per ton at the breaker, that alone would be a reason for ending the discrimination in favor of the vein, because such a price evidently would justify the lessee in paying the same royalty on all the coal going through the breaker.

## OUR CONSTRUCTION OF THE FIFTEENTH PARAGRAPH IS REASONABLE AND IS JUST TO BOTH PARTIES.

A judge undoubtedly leans to a construction of a contract which is reasonable, and which does not give to one party an unfair advantage over the other. If there is a construction that is in harmony with the purpose of the parties in entering into the contract and is consistent with the terms of the contract, as written therein, that is the construction which should be adopted, rather than any other, although another construction may be offered and plausibly maintained.

It is this necessity for a reasonable and equitable interpretation of the lease that militates most strongly against the defendant's contention. The longer we study the lease the more convinced are we that the defendant's construction of the fifteenth paragraph is unreasonable, strained, and destructive of the mutual purposes of the parties in entering into the lease.

Defendant's counsel advance a theory which they claim meets the demands of the rule of reasonable con-

struction. We cannot state the argument in a better
way than in the words of the counsel themselves:

"We contend that there is nothing essentially unrea-
sonable in the provision as we interpret it. By the lease
the defendant was required to mine all the veins of coal,
the four-foot vein as well as the others. So far as ap-
pears from the instrument itself, there was no reason
why it should not commence mining in the four-foot
vein immediately in 1887. If it did so and found the
vein, as evidently was anticipated, thin, it would be re-
quired to pay a rate of royalty very small as compared
with the royalty on the other coal, and it would have the
privilege of mining as much as it could for five years of
the four-foot vein coal at the small rate of royalty. Evi-
dently, in compensation for what the lessor would lose
in this way, it was provided in paragraph fifteen that if,
after five years of mining at these low rates of royalty,
the price of coal should reach $2.15 per ton, the royalty
rates on four-foot vein coal should be the same as upon
that of the other veins, and as a further compensation
for the royalties which the plaintiff would have lost had
the mining been carried on in the four-foot vein during
these five years, it was not at all unnatural that an even
higher rate should be provided for if the price of coal
warranted it. For example, let it be assumed that three
hundred thousand tons of coal above the size of pea
coal could have been secured from the four-foot vein
upon the premises and that the lessee considered it to its
advantage to press the minings in that vein with excep-
tional energy, in view of the small rate of royalty, so that
in the five years during which that royalty would con-
tinue, whatever the price of coal, it had taken out two-
thirds of the four-foot vein, or two hundred thousand
tons, the vein being less than three and one-half feet
thick, in that case it would have paid but thirty thou-
sand dollars in royalties for the two hundred thousand
tons at fifteen cents, while the rate of royalty upon the
same quantity of coal from the other veins would have

yielded fifty thousand dollars. It is entirely conceivable that under the provision for the payment of a higher rate of royalty than even the twenty-five cents per ton, if coal should bring a price so improbable at that time as 'to seem a dream,' in the language of Judge KELLY, the defendant should have been quite willing to agree to pay a higher price which might in some way compensate for the loss which the plaintiff has sustained by reason of the previous minings at the lower rate."

The foregoing argument suggests a possible theory as to the intentions of the parties as expressed in the third and fifteenth paragraphs of the lease; but the theory is unsound and specious, and leads the mind into a field of speculation. When we consider the fact, admitted on the record, that not a ton of coal was mined from the four-foot vein until 1907—twenty years after the date of the lease—We are strongly convinced that the defendant does not successfully answer the rule requiring a reasonable interpretation of the lease.

It is clear that the subject-matter of the third and fifteenth paragraphs is "royalties," with an exception in the third as to the rate to be paid for the coal from the four-foot vein. The elimination of the favor to this vein by the first clause of the fifteenth paragraph, leaves the remainder of the paragraph applicable to all the coal from all the veins. We have already stated that the two paragraphs covering the question of royalties must be construed together; and in the effort to do this we have inserted the first clause of the fifteenth paragraph as a part of the exception in the third paragraph, where it properly belongs, because it deals with the exceptional treatment given by the lease to the four-foot vein. If this transposition is proper, then there can be no question as to the real meaning of the fifteenth paragraph. In providing for the payment of a share of the excess royalty to the lessor, in broad and comprehensive terms, the conclusion is inevitable that it covers the royalty to be

paid on all the coal going through the breaker, regardless of the particular vein producing the coal.

Any other interpretation of the fifteenth paragraph would lead us into difficulty. If the whole of the paragraph relates to the coal from the four-foot vein the anomaly would present itself of a higher royalty being paid for the coal from the poorest vein, which would be against the general scheme of the lease in regard to royalties, and against the dictates of good sense. And, on the same basis, the proviso in the fifteenth paragraph relating to pea coal would require an extremely unreasonable construction. The proviso states that when the price of pea coal equals that of any of the sizes above pea, then, pea coal shall be included with the "other sizes" in making up the "average" and shall be subject to the "increased royalty." How can such a provision be confined to the four-foot vein? The coal from all the veins go into one breaker; the pea coal is the result of the breaker preparation of all the coal; the "other sizes" relates to the sizes into which the total production of the coal from all the veins is divided, and the "average" can have no proper meaning unless it means the average price of all sizes of all the coal going through the breaker.

We shall not further extend this discussion. We are satisfied that the contention of the plaintiff must prevail.

The court entered the following judgment:

Judgment: "By order of court May 1, 1911, judgment in the above case was ordered to be entered for the plaintiff for the sum of $317,475.83, with interest, and it was further suggested that the parties should agree upon the computation of interest. It now appears that the parties have agreed upon the computation of interest up to May 1, 1911, the interest so agreed upon amounting to the sum of $100,563.20. Judgment is therefore now directed to be entered in favor of the plaintiffs for the sum of $418,039.03, with interest from May 1, 1911."

Errors assigned were in various findings of fact and conclusions, and the judgment of the court.

John G. Johnson, with him Thomas H. Atherton and James H. Torrey, for appellant.—While in the interpretation of contracts the rules of grammar and punctuation may be of secondary importance, as found by the court below, yet an interpretation in accordance with these rules ought to be preferred to one that violates them: Joy v. St. Louis, 138 U. S. 1 (11 Sup. Ct. Repr. 243).

The court ignored the rules of grammar and punctuation in clause 15, and ingeniously re-arranges the whole clause to sustain the plaintiff's interpretation.

That the advance in royalty rates when the price of coal should exceed $2.15 after 1892, was not intended to apply to coal from veins other than the "Four Foot Vein" appears from the construction given to the lease by the acts of the parties: Kendall v. Klapperthal Co., 202 Pa. 596; Bower v. Walker, 220 Pa. 294; Uinta Tunnel Min. & Transp. Co. v. Ajax Gold Mining Co., 141 Fed. Repr. 563; Meyer v. Christopher, 176 Mo. 580 (75 S. W. Repr. 750) ; McKeever v. Westmoreland Coal Co., 219 Pa. 234; McMillan v. Titus, 222 Pa. 500; Gass's App., 73 Pa. 39; Gillespie v. Iseman, 210 Pa. 1; People's Natural Gas Co. v. Braddock Wire Co., 155 Pa. 22.

Everett Warren and M. Hampton Todd, with them Henry A. Knapp and John P. Kelly, for appellee.—The punctuation of an instrument may be considered when the meaning is doubtful, but it cannot control if the meaning otherwise plainly appears.

That construction is to be placed on a document such as will render it reasonable rather than unreasonable, and just to both parties rather than unjust.

PER CURIAM, February 24, 1913:

Upon a careful consideration of this appeal by the

whole court, a majority are of opinion that the judgment should be affirmed for the reasons stated by the learned President Judge of the Common Pleas.